**The STATE of Ohio**

v.

**TYREN.**

Court of Common Pleas of Ohio,
Ottawa County.

No. 97–CR–145.

Decided March 13, 1998.

*Mark E. Mulligan*, Ottawa County Prosecuting Attorney, for plaintiff.

*Donahue & Nunnari* and *Jeffrey P. Nunnari*, for defendant.

PAUL C. MOON, Judge.

On October 24, 1997, the Ottawa County Grand Jury returned a three-count indictment against defendant herein, Christopher Tyren. Each count alleges one

offense of gross sexual imposition against a child less than thirteen years of age. The time of each incident is stated to be during a period commencing March 28, 1990 through October 31, 1990. Defendant has filed a motion to dismiss the three counts of the indictment and, in the alternative, a motion to suppress statements allegedly made by the defendant. These motions were heard by the court February 27, 1998 and March 2, 1998.

On February 10, 1997, proceedings were held in the Ottawa County Juvenile Court, *In the Matter of Sadie and Leahanne Tyren, Alleged Abused and Dependent Children* (of defendant and his wife, Helen), case No. 96300039. At the hearing, defendant appeared with attorney Walter Skotynsky, while defendant's wife, Helen, appeared *pro se*. The two daughters were represented by their guardian *ad litem*, Michelle Christie. The children did not testify at the hearing. The state was represented by Ottawa County Assistant Prosecutor Bruce Winters.

This hearing was to have been the culmination of a series of events which began in the fall of 1996 when defendant first learned that he was under investigation by the Ottawa County Department of Human Services for possible child abuse. Defendant was first contacted by Betsy Gordon of the Ottawa County agency in November 1996 and advised that the alleged victim of the abuse was defendant's adopted daughter, Sadie, who would have been eight years of age at the time of the alleged incidents.

On the second or third day of trial in the juvenile court, the parties began discussions that they hoped would settle and resolve the matters at issue before the juvenile court. Defendant's Exhibit D is the February 17, 1997 order of the Ottawa County Juvenile Court resulting from the negotiations and subsequent apparent agreement of the parties struck February 10, 1997. Critical to the resolution of these pending motions is defendant Tyren's insistence that there was an agreed additional provision that was not contained in the court's dispositive order. Defendant has testified that he was assured that there would be no further criminal prosecution if he entered treatment as required by the juvenile court.

The testimony on this critical point is as follows: Defendant testified that an agreement was reached regarding therapy for all family members and, in particular, sex offender treatment for the defendant, which if followed would result in no further proceedings being instituted. Defendant insists that there was included in the agreement a prohibition against all further proceedings arising from the disclosed events, including criminal prosecution. Defendant testified further that he would not have participated in the negotiations had he known there would be further prosecutions. He agreed to enter sex offender counseling and further knew he would have to admit to all incidents of abuse, that

is, "come clean"—an integral part of the therapy. His stated goal at the time of the agreement was to achieve reunion with his family. He had then been separated from his family some six weeks and had only seen his six-year-old daughter once in the last two months. Defendant candidly admits that at that juncture of the proceedings, he would have "agreed to anything" in order to bring the family together again. He could not see his children because he had not given a statement of responsibility for his actions.

When it came time for him to make his "statement of responsibility," defendant's sex abuse counselor, William Emahiser, invited Human Services Investigator Betsy Gordon into the conference room to tape record defendant's statement. At that time defendant had been in treatment for some six months. No *Miranda* warnings were given before the taping, nor was defendant advised of his right to have an attorney present. Defendant relates that he was nervous and did not decline to make the statement. No one explained to him the possible consequences of the statement. Approximately twenty minutes after making his statement, he asked the investigator whether he could be prosecuted for his statement, and she responded, "Possibly." Almost immediately after making the so-called "statement of responsibility," defendant was provided visitation with his daughter.

Attorney Walter Skotynsky testified that he did indeed represent defendant at the February 10, 1997 hearing in the juvenile court and that he carried on negotiations with Assistant Prosecutor Bruce Winters. Skotynsky states that he and Winters early on in the negotiations discussed a cessation of further criminal prosecution if defendant made a complete and truthful statement, participated in a sexual abuse program, and obtained therapy for the entire family. Skotynsky is adamant that he would not have participated in negotiations if he thought that there would be later criminal charges filed against his client.

The testimony of defendant and attorney Skotynsky establishes *at the very least* an understanding that there would be no further criminal prosecutions. The testimony of Assistant Prosecuting Attorney Winters does little to alter that proof:

"Q. Isn't it true, Mr. Winters, that during the course of your negotiations and the days preceding February 10 and maybe even on February the 10th of 1997, that you told Mr. Skotynsky that the State was not interested in pursuing any criminal charges against Christopher Tyren?

"A. I don't recall making any statement like that.

"Q. Are you saying that you didn't make a statement?

"A. I am saying I don't recall making any statement like that.

"Q. Are you aware that Mr. Skotynsky has testified previously today?

"A.   I know he was subpoenaed.

"Q.   Would it surprise you if he said that you did make such a statement to him?

"A.   Surprise?   All I can say is I don't have any recollections of whether that statement was made or not.   I don't recall it being made.

"Q.   So it is possible then that you did tell him that?

"A.   It is possible.   I don't have any recollection of whether any agreement was made or not.

"Q.   If he made such a statement, do you think it would be reasonable for Mr. Skotynsky to have relied upon it?

"A.   If it were an agreement between Mr. Skotynsky and I, I believe it would be reasonable for him to rely upon it.

"Q.   Would it be logical then that his client—would it also be reasonable for his client to rely on such a statement if he were made aware of it?

"A.   Yes."   (*State of Ohio v. Tyren,* case No. 97–CR–145, Testimony of Bruce Winters, given February 27, 1998.)

William Emahiser, a clinical therapist with Unison Behavioral Health Center, testified that he was Tyren's therapist but not the first therapist at Unison to work with Tyren.   Much of the initial advisement of procedures and rights, including the client's bill of rights (Defendant's Exhibit A) and other allied documents, a relapse prevention plan, and a statement of responsibility worksheet were given to defendant either by the first therapist or Emahiser.   The testimony is not clear as to which of the two therapists would have given the Exhibit A packet to defendant.   Emahiser was clear in his testimony, however, that in order to successfully complete the sexual offender program, defendant would have to make a statement accepting responsibility, that act being tantamount to a confession of prior incidents of abuse.   Emahiser made it equally clear that defendant was primarily motivated by the strong desire for reunification of the family and the compelling desire to see his younger daughter.   These goals could not be achieved unless and until defendant made his so-called "statement of responsibility."

The circumstances of the August 6, 1996 meeting at a Unison group therapy room were indicative of the manner in which information was conveyed to Tyren and how he was handled by the two agencies (counseling and human services).   The meeting was called because Tyren apparently had indicated a desire to take full responsibility for his actions and make a complete statement, *i.e.,* minimize his risk of reoffending.   He could not see his child until the risk was lowered.   In September and October, Christopher Tyren stepped up his efforts to see his

daughter, but he first had to make his statement. The counselor asked the Department of Human Services' investigator to come in and tape the statement of Tyren. The client's bill of rights (Defendant's Exhibit A), according to Emahiser, accords clients the same rights as ordinary citizens, but Emahiser does not recall whether he explained to Tyren possible consequences of the statement. Chris Tyren had a right to refuse "observation techniques such as tape recording," but Emahiser did not explain that to Tyren on the date of the meeting. Tyren had a right to have legal counsel present, but that was not then explained to the defendant on August 6, 1996. Indications are that the explanation would have been given by the primary therapist at some unknown date in the past. Emahiser had no personal knowledge whether Tyren was so advised. Betsy Gordon of the Ottawa County Department of Human Services testified that the Tyren case was hers, that no *Miranda* warnings were given prior to taking Chris's statement, and that she arranged to have the statement taped. Gordon also testified concerning a December 12, 1996 meeting at the Bureau of Criminal Investigation in Fremont at which Tyren was nervous and cried. There was no evidence that he was intoxicated, and reunification of his family was ever present on his mind. The purpose of the BCI meeting was to polygraph Christopher Tyren. However, since he made an admission of sexual contact with the victim prior to the test, no polygraph test was given. At BCI, Tyren was under no compulsion to remain, but having remained, no test was given to him.

Christopher Tyren now stands indicted for the statements made August 6, 1996 and December 12, 1996. These statements were made during the course of therapy, the counselor and investigator having left no doubt in the mind of Christopher Tyren that the statements were absolutely essential if he was to see his child and ever hope to reunify the family. Christopher Tyren is still in treatment at the present time.

It is unconscionable and offends every notion of due process and fair play for the agents of the state of Ohio to have negotiated a resolution of the juvenile court abuse and dependency matters by requiring of defendant Christopher Tyren sex offender treatment when the agents of the state knew in advance that an integral and absolutely necessary part of that therapy required defendant to admit acts of abuse and then when the admissions were made in the course of therapy, prosecute defendant criminally on the basis of the admissions.

" '*Dismissal by the court.* If the court over objection of the state dismisses an indictment, information, or complaint, it shall state on the record its findings of fact and reasons for the dismissal.'

"Crim.R. 48(B) recognizes by implication that trial judges may *sua sponte* dismiss a criminal action over the objection of the prosecution, since the rule sets forth the trial court's procedure for doing so. The rule does not limit the reasons

for which a trial judge might dismiss a case, and we are convinced that a judge may discuss a case pursuant to Crim.R. 48(B) if a dismissal serves the interests of justice.

"Trial judges are at the front lines of administration of justice in our judicial system, dealing with the realities and practicalities of managing a caseload and responding to the rights and interests of the prosecution, the accused, and victims. A court has the 'inherent power to regulate the practice before it and protect the integrity of its proceedings.'" *Royal Indemn. Co. v. J.C. Penney Co.* (1986), 27 Ohio St.3d 31, 33–34, 27 OBR 447, 449, 501 N.E.2d 617, 620, as cited in *State v. Busch* (1996), 76 Ohio St.3d 613, 615, 669 N.E.2d 1125, 1127–1128.

While *Busch, supra,* is a domestic violence case, the broad principles of due process and fair play announced therein apply equally to the instant matter.

The indictment against Christopher Tyren should be and is hereby DISMISSED.

*Indictment dismissed.*